UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>RAHSHJEEM BENSON,<br><br>    Defendant. | Criminal No. 19-10174-LTS |

**MOTION *IN LIMINE* TO PERMIT 404(b) EVIDENCE
TO PROVE KNOWLEDGE, MOTIVE, AND INTENT**

  The government moves *in limine* to admit evidence found on defendant Rahshjeem Benson's cell phones indicating that Benson was engaged in drug dealing in the six months prior to his arrest by the Boston Police in this case, to demonstrate his knowledge of and "compelling motive" for possessing the firearm and ammunition in this case.[1] *See, e.g., United States v. Moon*, 802 F.3d 135, 144-145 (1st Cir. 2015).  The government also moves *in limine* to admit evidence from Benson's phones that in the six months leading up to his arrest in this case, including directly after he was shot, Benson had expressed an interest in acquiring a firearm, in order to demonstrate his knowledge of and motive and intent to possess the firearm in this case.  This evidence – consisting of non-hearsay statements of the defendant and images and videos found on his phones – is relevant and admissible evidence of his knowledge, motive, and intent to possess the firearm

---

[1] The government also intends to offer at trial evidence that Benson sold drugs just minutes prior to his arrest, both as evidence of his knowledge, motive, and intent to possess and the firearm, as well as to demonstrate why the officers took the actions they did on the night of his arrest and the context of the arrest. Although the Facts section includes this context, this motion does not specifically address the admissibility of that evidence, but rather the admissibility of *prior* drug and gun-related activity.  The government views the evidence of Benson's drug sale directly prior to his arrest as admissible as intrinsic evidence to this case, rather than 404(b) evidence; if the Court disagrees, the government reserves the right to seek to admit it as 404(b) evidence.

and ammunition in this case.

## FACTS

### Events of April 5, 2019

Around 8:00pm on April 5, 2019, officers in the Boston Police Department's District 4 Drug Control Unit observed what they believed to be a hand-to-hand drug transaction between Rahshjeem Benson and Philip Walsh.  Around 7:40pm, an undercover officer, Matthew Ryan, had asked Walsh to procure "grease" (*i.e.*, crack cocaine), and Walsh borrowed a phone from someone off the street and made a call.  Officer Ryan heard Walsh talk to someone he called "Six Nine" and then followed Walsh to the area of Whiskey's Bar, located at 885 Boylston Street in downtown Boston.  Officer Ryan handed Walsh previously-recorded buy money, and then watched as Benson exited Whiskey's Bar and met with Walsh in an alley.  Walsh handed the money to Benson, and then the two walked behind a building.  When they returned, they were both manipulating items in their hands.  Benson then returned to Whiskey's, and Walsh provided a rock of crack cocaine to Officer Ryan.  The DCU officers then placed Walsh under arrest, and five officers went into Whiskey's Bar to arrest Benson.  After a struggle inside the bar, the officers were able to handcuff Benson and remove him from the bar.  They also seized his cell phones from the bar counter and recovered the previously-recorded buy money amidst a total of $1050 in Benson's possession. Outside the bar, in a search incident to arrest prior to transporting Benson to the police station, police found a firearm in his sweatshirt pocket.

### Phone Evidence of Benson's Drug Dealing In Six Months Leading Up to Benson's Arrest

The government sought and obtained a search warrant for the two iPhones seized incident to Benson's arrest.  The phones contain evidence that Benson was engaged in drug trafficking. Such evidence includes, but is not limited to, the following:

- Messages between Benson and "Denise Copley" on October 16, 2018, in which Denise says, "can u please PLEASE be available at 1am. I'll take a cab to wherever u r. I need a whole bisket and 3 fat ones.  Bulky ones. OK?  Leave the knot out and I'll take good care. Lol.  Please.  PLEASE AND DONT TELL Any One IM COMING OUT THERE. VULTURES."  Benson responds, "Cool."  That night Denise writes, "We still on for tonight?"  Benson responds, "I don't got the ball on me I got all bumps but I'll give u 22."[2]

- Messages between Benson and Denise on October 19, 2018, in which Denise says, "Please tell me u r still out here. Im gonna need u in about 45 for replenish if u can.. pretty please." Benson responds, "Wat u got" and "And u got to hurry."  Denis responds, "100," "Ready now," "Wry."  Benson responds, "Whiskey," "OK," "I got 10 for u."

- Messages between Benson and "Ryan" on October 22, 2018, in which Ryan asks where he can meet Benson, and Benson replies, "Copley."  Ryan asks, "Are your grams actually grams right now?  I need full gs dude I shoot a whole gram at once to get high and those big ass plastic knots rolled up in the bag aren't going to cut it for me.  What would 2 legit grams run me?"  Benson responds, "I got five Gs for u and I'm only going to 200."  They then continue negotiating price and amount and ultimately Ryan tells Benson he is at a "bus stop across from church."

- Messages between Benson and Ryan on October 23, 2018, in which Ryan asks Benson, "You have hard?"[3] and Benson responds, "Yeah always" and adds, "And bud."[4]

- Messages between Benson and Ryan on December 21, 2018 in which Ryan asks, "Can you deliver hard?" Benson responds, "I'm not driving."  Ryan asks, "Where are u" and Benson responds, "Whiskey bar on Boylston and Gloucester Street."  Ryan asks, "You have any d?" and Benson responds with a thumbs-down emoticon.  Ryan then asks, "Can I grab a 40 of hard?" and Benson responds, "Yup."  When Ryan states that he is there, Benson says "I'm coming out."

- Messages between Benson and the user of a phone ending in -8226 on February 21, 2019, in which 8226 asks, "Are you back at whiskeys?" and Benson responds, "Yup."  About 40 minutes later, 8226 says, "Go to the alley." Similarly, on February 22, 2019, 8226 asks, "You at whiskeys?" and Benson replies "Yeah."  8226 say, "Here's what's going I I have to come see u I have forty then I have to go to Everett to meet my mother and grab that money from her she gets off at six thirty . I know what the numbers are for everything, so we are on the same page. Cool?" and Benson responds, "Ok."  12 minutes later, 8226 states, "Alley."

---

[2] The government anticipates that a law enforcement witness would testify that in his training and experience "bumps, "baskets," and "balls" refer to quantities of cocaine.

[3] The government anticipates that a law enforcement witness would testify that in his training and experience "hard" refers to crack cocaine.

[4] The government anticipates that a law enforcement witness would testify that in his training and experience "bud" refers to marijuana.

- Messages and photos sent between Benson and "Reem Bullz" on February 22 and 23, 2019. Reem sends Benson multiple pictures of what appear to be drugs. In one of the pictures the drugs appear to have turned green and are crumbly. Reem explains that the drugs turned green because he put them on some green cardboard, but he complains about the consistency of how the drugs turned out when cooked and says, "i lost out n---- i gave u 2500 for 50 basically get me right bro." Benson argues that the person who cooked it didn't know what they were doing. Reem sends two pictures of what appear to be smooth "cookies" of crack cocaine and argues, "its not the same shit" and must have been "cut with mad shit" because he has used the same person multiple times and "everytime he do my shit it come back a cookie jus like that . . . It only crumbles up like that when its mad shit in it." Benson says, "I used the other half of wat I didn't give u to cheff." Reem responds, "I know work bro. My ppls shit don't do that . . . ." Benson reminds him "U opened [it] in my crib" and Reem says, "Yeah n---- and u could smell it was mixed with something . . . that shit had somethin in in bro the shit was bubbling before n----z even put the bake in it thats how u know it was stepped on all i know is the n---- do the same thing he always do thats why i go to him he the only n---- i let do my shit that n---- wrist is sick bro im tellin u it was the work." Benson ultimately tells Reem to "bring the work" and promises to make it right. Reem says, "Ok on doggz im gon let u do the next one," "And we gon see smh," and Benson says, "Ok bet."

- Messages between Benson and Ryan on March 15, 2019, in which Ryan asks, "Yo will you be around when I get out of work at 630? I'll be coming from Fields Corner" and Benson responds, "I'm going to be in copy. Copley." That evening Ryan texts, "Yo, you around?" and Benson responds, "My boy is at whiskey I told him u was common. Coming."

- Messages between Benson and "Whiteboy" on March 23, 2019, in which Benson tells Whiteboy he is in Atlanta; Whiteboy responds, "Fuck. I wanted something."; Benson says, "Sorry"; Whiteboy asks, "Do you have anyone here"; Benson asks, "Wat u wanted"; Whiteboy responds "hard"; and Benson responds "Ok."

- Messages between Benson and "Charlie Trap" just before midnight on April 1, 2019, in which "Charlie" states, "I'm looking for coke"; Benson replies, "Soft" and "Or hard"; Charlie says, "I would prefer soft"; Benson states, "I don't got no soft I just sold my last" but agrees to sell hard, asks how much Charlie wants, and states that he is in Copley at 855 Boylston Street.[5] Charlie then agrees to meet him there and asks, "Do u knowwhere I can buy a stem"[6] and Benson directs him to a gas station that is open 24/7. Around 12:47am Charlie says, "Walking to u."

---

[5] The government anticipates a law enforcement witness would testify that "coke" is a reference to cocaine; "soft" refers to powder cocaine; and "hard" refers to crack cocaine. The address for Whiskey's bar was 885 Boylston Street.

[6] The government anticipates a law enforcement witness would testify that a "stem" is a reference to an apparatus used to smoke crack cocaine.

4

- A 20-second video from April 4, 2019, in which Benson has a large quantity of $100 bills spread out in his lap inside a car, and states, "Y'all n---- playing, Benson ain't playing, Y'all n---- playing, Y'all n---- playing, man. Y'all n---- playing, y'all n---- playing?" He then turns the camera to show his face and says, "Y'all n---- playing? I'm not playing. Y'all n---- playing" and pans back to the cash on his lap.[7]

- Messages between Benson and "Day" on April 4, 2019, in which Day asks, "Yo six canbya do me a half for 80 tryin to gt my shit bck on point got u with 20 next trip or a basketem either way it go I got u in 2 days at most bro just need to gt my shit back on point?" Benson asks, "Are u able to get a ride?" and Day responds, "I can try, to where bro?" and Benson responds, "885 Boylston Street."

- A message from Benson to "Charlie Trap" on April 5, 2019 at 3:45pm, in which Benson states, "I'm going to try and have that brown today."[8]  At 7:18pm – around 40 minutes before the drug transaction that led to Benson's arrest in this case – "Charlie" asked, "Anything?"; Benson responded at 7:32pm, "Waiting still."

**Phone Evidence of Benson's Motive and Intent to Possess the Firearm In the Six Months Leading Up to Benson's Arrest[9]**

The defendant's phones also contain evidence that Benson intended to acquire and possess the firearm.  Such evidence includes, but is not limited to, the following:

- Messages Benson sent about wanting a gun in October 2018, including:

    o Messages from Benson to "Josh Umass" on October 9, 2018 in which Benson states, "Yo that mother fucker shot at me lastnight again," "Over by massave," and "U can't get me a gun," followed by texts in which the two discuss the price and

---

[7] The government anticipates arguing that Benson knowingly possessed a firearm to protect his drugs and his drug sale profits.  The display of a spread of $100 bills in Benson's lap, recorded around the same time that Benson is having the drug-related conversations described below, is evidence of that motive.

[8] The government anticipates a law enforcement witness would testify that "brown" is a reference to heroin or fentanyl.

[9] The government only seeks at this time to introduce the evidence from the six months prior to the defendant's arrest.  However, the government notes that there is additional such evidence on the phone dating back further, including:

- Messages between Benson and an unknown individual, who identifies himself as working for a firearm manufacturer, on June 22, 2017, in which Benson states, "I need a gun can u get me one if I give u the money" and "I want this right here," attaching a photo of a black firearm.  The other individual stated that he could not get him that firearm, because it wasn't manufactured by the company that he works for.

- A message from Benson to "Neicy" on July 17, 2017 at 10:44am, in which Benson states, "I got to get a gun cause I'm not dying out here like that."

5

        Benson asks Josh to call him.

- Messages between Benson and a phone number ending in -2622 on October 10, 2018, in which Benson states, "I need a gun" and later sends a photo of his bandaged hand.

- Messages from Benson to "Bg 2" on October 10, 2018, in which Benson states, "This n--- just shot at me and geo I need a gun." After Bg 2 tells Benson to stay out of the streets and in his home with his kids, Benson replies, "I get money in the streets."

- Messages between Benson and "G Moke" on October 30, 2018, in which G Moke says, "Remember the other thing u mentioned?" and Benson responds, "Yeah." G Moke says, "Got 1." Benson asks, "What the damage" and G Moke responds, "Even 7" and "It's a beauty." Minutes later, Benson sends G Moke a picture of his bandaged arm and says, "To late." G Moke says, "U got hit again son?" Benson responds, "Last night."

- A message from Benson to "Darin Cuz Nyc" on November 1, 2018 at 10:42am, in which Benson states: "When I had a gun on me I never had no problems."

- Messages between Benson and "Luis Lawrence" on December 26, 2018, in which Luis sends Benson a photo of a black firearm; Benson replies, "Wats that a high point"; Luis responds, "Ya"; Benson inquires about the price for "my man" before saying "My man said that's too much."

- Messages between Benson and an unknown individual on February 18, 2019, in which the individual sends Benson photos of a black firearm and ammunition cartridges and a fan of $100 bills; Benson replies, "I want it," and approximately twenty-five minutes later, "I want that pistol."

- Messages between Benson and "Darin Cuz Nyc" on March 14, 2019, in which Darin says, "4-50… Copley ima give him ya #." Benson responds, "Ok well if something happens to my u have a good idea and u will put the pieces together for my mother." Darin responds, "See stop talking crazy." Benson responds, "Well it's the truth cause I don't know who to trust but just know I'm shooting back." Darin responds, "Just stay outta the way. And live (tone it down a lot)."[10]

The government proposes introducing some or all of these messages, photos, and videos through

---

[10] A few minutes later, Darin said, "The play just called u." Benson responded, "Andrew," and Darin confirmed, "Yup. 4-50." Benson responded, "He said he want a half gram of powder." Darin said, "Even better." Benson responded, "Facts." The government would seek to introduce this portion of the message string as well, as further evidence of Benson's drug dealing providing the motive for possessing the firearm and suggesting that his possession of it was knowing.

the testimony of the detective who completed the extractions of the phones, who will authenticate the messages as having been stored on the phones; other officers will testify about the recovery of the phones from Benson. The government proposes introducing the testimony of one of the Drug Control Unit officers as to the meaning of the drug terminology used in the messages. *See United States v. Henry,* 848 F.3d 1, 10 (1st Cir. 2017) (finding no error in court's admission of expert testimony regarding interpretations of drug-related text messages, and noting the "formidable body of precedent" permitting government witnesses with experience in drug investigations to translate coded language for juries through lay or expert testimony).

## ARGUMENT

The drug- and gun-related evidence on the phones is relevant and admissible under the Federal Rules of Evidence.

Evidence of uncharged crimes, wrongs, or acts may be admissible for purposes such as "proof of *motive*, opportunity, *intent*, preparation, plan, *knowledge*, identity, or absence of mistake or accident." Fed. R. 404(b) (emphasis added). In the First Circuit, evidence of prior bad acts may be admitted if it passes a two-part test. First, the evidence must have "special relevance" to an issue in the case without including "bad character or propensity as a necessary link in the inferential chain." *United States v. Gentles*, 619 F.3d 75, 86 (1st Cir. 2010) (citing *United States v. Frankhauser*, 80 F.3d 641, 648 (1st Cir. 1996)). Second, the evidence must survive analysis under Federal Rule of Evidence 403. *United States v. Whitney*, 524 F.3d 134, 141 (1st Cir. 2008); *United States v. DeCicco*, 370 F.3d 206, 211 (1st Cir. 2004). The drug- and gun-related evidence that the government intends to introduce at trial, satisfies both prongs.

Moreover, the messages are non-hearsay because they consist of the defendant's own statements, which are excluded from the definition of hearsay. The statements of the individuals

with whom Benson is conversing are not admitted for the truth of the matter (*i.e.*, that they actually want a particular quantity of cocaine, or that the drugs had in fact been cut with something different), but rather to demonstrate the context for the defendant's non-hearsay statements (including his agreement to do what the other individual asked, such as sell them a particular quantity of cocaine, or his acknowledgement that he had provided them with the drugs).

I.   **THE DRUG EVIDENCE HAS SPECIAL RELEVANCE TO BENSON'S KNOWLEDGE OF AND MOTIVE FOR POSSESSING THE FIREARM**

The evidence that Benson was engaged in drug dealing in the six months leading up to his arrest has special relevance to his knowledge of and motive for possessing the firearm and ammunition. The First Circuit has held that uncharged bad-act evidence has special relevance under 404(b) if it pertains to issues such as the defendant's intent, knowledge, plan, absence of mistake, or identity. *United States v. Varoudakis*, 233 F.3d 113, 118 (1st Cir. 2000). Where the other bad act evidence is introduced to show knowledge, motive, or intent, the Rule 404(b) exceptions to the prohibition against character evidence have been construed broadly. *United States v. Flores Perez*, 849 F.2d 1, 4 (1st Cir. 1988). All that is required is that "at least one permissible inference is possible." *United States v. Ferrer-Cruz*, 899 F.2d 135, 138 (1st Cir. 1990).

Here, the drug evidence is admissible to show the defendant's motive to possess the firearm. The First Circuit has held that evidence of "drug dealing provides a compelling motive for possessing [a] gun, namely, to protect [the] drugs and drug money." *United States v. Smith*, 292 F.3d 90, 99 (1st Cir. 2002) (approving of the admission of evidence of the defendant's drug dealing activities in the ten days prior to the discovery of the firearm, and noting that several other circuits also "approve[] the admission of evidence of a defendant's drug activities in a firearms possession case to show a motive or knowing possession of the firearm"); *Moon*, 802 F.3d at 144-145 (finding no abuse of discretion in the admission of testimony about drug paraphernalia found

8

in the defendant's bedroom to demonstrate his involvement in drug trafficking and demonstrate motive for possessing the firearm); *United States v. Torres-Rosario*, 658 F.3d 110, 114 (1st Cir. 2011) (stating that "the government was free to invite the jury to infer that Torres—Rosario dealt in drugs" based on the discovery of drugs and baggies in his bedroom, "furnishing a motive for him also to possess a gun to protect them"); *United States v. Weems*, 322 F.3d 18, 25 (1st Cir. 2003) ("As in Smith, the evidence of drug dealing at the house was relevant. It certainly gave Weems a motive to have the gun on him.").

## II. THE FIREARM EVIDENCE HAS SPECIAL RELEVANCE TO BENSON'S KNOWLEDGE, MOTIVE, AND INTENT TO POSSESS THE FIREARM

Furthermore, the evidence that Benson had been shot six months before the offense, and had expressed an interest in acquiring a firearm over the next six months leading up to his arrest, has special relevance to his knowledge of and motive and intent to possess the firearm and ammunition in this case.

Although undersigned counsel was unable to find an analogous case in the First Circuit, in a comparable § 922(g) case, the Fourth Circuit upheld admission of 404(b) evidence, including the defendant's own text messages from three months prior to the crime, "discussing buying and selling firearms" as "relevant to and probative of whether [the defendant] knowingly and intentionally possessed the handgun." *United States v. Walker-Bey*, 800 Fed. Appx. 161, 164–65 (4th Cir. 2020); *see United States v. Williams*, No. 1:20-cr-00121, 2020 WL 7318006, *5 (D.C. Cir. Dec. 10, 2020) (admitting text messages from two months prior to the crime under 404(b) in a § 922(g) case, where contacts sent the defendant photographs of firearms for sale and the defendant "responded by either *inquiring about the cost* or offering a price for the weapon") (emphasis added); *United States v. Jefferson*, 975 F.3d 700, 705–06 (8th Cir. 2020) (admitting text messages discussing firearms from two months prior to the crime under 404(b) in a § 922(g) case

9

to demonstrate the defendant's "*motive* to possess the firearm" in question) (emphasis added).

Here, the messages regarding Benson's efforts to acquire a firearm are admissible to show the defendant's motive and intent to possess the firearm seized from his person during his arrest, and his knowledge that it was there. In October 2018, Benson told multiple people that he had been shot, and in connection with delivering that news expressed an interest in acquiring a gun. Four months prior to his arrest and after receiving a photo of a firearm from "Luis Lawrence," Benson inquired about the price of a firearm. Moreover, less than two months prior to his arrest and after receiving a separate photo of a firearm, Benson told an unknown individual: "I want that pistol." Then, in the text message from March 14, 2019 – two days after the firearm that Benson possessed had been reported stolen out of New Hampshire, and less than three weeks before Benson's arrest – Benson arguably makes an admission to having a firearm, stating that if an intended drug deal or "play" goes badly, "just know I'm shooting back." These messages, among others, clearly show the defendant's knowledge, motive, and intent as to possession of the firearm seized during his arrest.

### III. ANY PREJUDICE FLOWING FROM THE ADMISSION OF THE DRUG- AND GUN-RELATED EVIDENCE IS NOT UNFAIR AND CAN BE PREVENTED WITH A LIMITING INSTRUCTION

The drug- and gun-related evidence should not be excluded under Rule 403. Only when the probative value of evidence is *substantially* outweighed by the danger of unfair prejudice should a court exclude it. Fed. R. Evid. 403 (emphasis added). The bar is high. Defendants are protected only "against unfair prejudice, not against all prejudice." *Gentles*, 619 F.3d 75 at 87 (quoting *United States v. Rivera-Gomez*, 67 F.3d 993, 997 (1st Cir. 1995)). Indeed, "most evidence offered against a defendant[] is prejudicial," *United States v. Guyon*, 27 F.3d 723, 729 (1st Cir. 1984). Rule 403 is concerned only with unfair prejudice, which carries a genuine risk

"that the emotions of the jury will be excited to irrational behavior, and that the risk is disproportionate to the probative value of the evidence." *United States v. Fahey*, 769 F.2d 829, 849 (1st Cir. 1985) (quoting *United States v. Zeuli*, 725 F.2d 813, 817 (1st Cir. 1984)).

No such danger exists here.  The government does not seek to introduce limitless drug-related evidence, nor evidence that would be likely to evoke an emotional reaction in the jurors. *But see Smith,* 292 F.3d at 100 (acknowledging that "illicit drug dealing is an emotionally charged public issue") (internal quotations omitted).[11]  Instead, the government seeks to introduce into evidence a sampling of text messages in the six months preceding his arrest by the Boston Police Department on April 5, 2019, demonstrating a pattern of drug sale activity that is consistent with what officers observed on April 5, 2019, and that provides a motive for Benson to possess the firearm.[12]  Similarly, the government only seeks to introduce a handful of gun-related text messages demonstrating that Benson had previously possessed a firearm, had expressed a desire to obtain a firearm in the months leading up to his arrest after being shot, and a final message that would allow the jury to infer that he had obtained the firearm by March 14, 2019.[13]

Moreover, a limiting instruction would ensure that the jury would not use the evidence for

---

[11] Although cases involving allegations of drug activity may evoke emotional responses in some jurors, voir dire in such cases carefully screens out jurors who cannot be impartial based on that issue.  Because the defendant's drug dealing the night of April 5, 2019 is inextricably linked to this case and intrinsic evidence in this case, the government's proposed questions for the venire include questions about their feelings about the drug laws and their ability to be impartial in a case involving drugs.  *See* Dkt. No. 98 at ¶ 7.

[12] The fact that the jury will already be hearing about Drug Control Unit officers arresting Benson after observing what they believed to be a hand-to-hand drug sale renders the additional evidence of drug activity less prejudicial.

[13]  The government acknowledges that the defendant's reference to "shooting back" could have some risk of prejudice.  But the risk of unfair prejudice does not substantially outweigh this evidence's probative value.  The government has not, as of yet, identified any other evidence on the phones that links the defendant to the specific firearm that was recovered on him (*i.e.*, photographs of himself holding that firearm or explicit communications referencing the firearm model).  Accordingly, the defendant's statement that as of March 14, 2019, he is in a position to "shoot back" – *i.e.,* has obtained a firearm – is important probative evidence that cannot be replaced with less prejudicial evidence.

an improper purpose. *See, e.g., Smith*, 292 F.3d at 100 (holding that a limiting instruction can prevent any unfair prejudice resulting from the introduction of drug-dealing evidence in a gun-possession case); *United States v. Williams,* 717 F.3d 35, 43 (1st Cir. 2013) (holding that "the district court's use of the Rule 404(b) framework in its limiting instruction was an appropriate way to focus the jurors on the purposes for which the evidence could legitimately be considered and to guard against any improper use of it"); *United States v. Santana*, 342 F.3d 60, 67 (1st Cir. 2003) (affirming admission of testimony about defendant's previous drug-dealing activity where the district court gave a limiting instruction).  Here, the government suggests that such a limiting instruction state that the defendant is charged only with being a felon in possession of a firearm and ammunition, and not any drug activity, and that any evidence of alleged drug activity and text messages about firearms may only be considered as to proof of motive, intent, or knowledge regarding the possession of the firearm, and not as evidence of bad character or propensity to commit crimes generally.

**IV.     THE MESSAGES ARE ADMISSIBLE AS NON-HEARSAY STATEMENTS OF THE DEFENDANT**

Finally, the government anticipates that the defendant might object to the introduction of some of the text messages on hearsay grounds; however, the messages the government seeks to submit consist of non-hearsay statements of the defendant and statements of other individuals that are being used for non-hearsay purposes.

Hearsay is defined at Fed. R. Evid. 801(c) as follows:

> "Hearsay" means a statement that:
>
> > (1) the declarant does not make while testifying at the current trial or hearing; and
> >
> > (2) a party offers in evidence to prove the truth of the matter asserted in the statement.

An opposing party's statement, offered against that party, is specifically excluded from the definition of hearsay. Fed. R. Evid. 801(d)(2)(A). Accordingly, all of Benson's statements in the messages are non-hearsay.

As to the other participants in the messages, the context of the messages suggest that some of the individuals, such as "Denise Copley" and "Reem Bullz" are engaged in drug distribution conspiracies with Benson, such that their statements would be non-hearsay under Fed. R. Evid. 801(d)(2)(E).

Moreover, the other individuals' messages are not being admitted for the truth of the matter asserted, but rather to provide context to Benson's statements, and thus they are excluded from the definition of hearsay. *See United States v. Dunnican*, 961 F.3d 859, 873 (6th Cir. 2020) (statements made by unidentified participants were not to show the truth of the matter asserted, but to provide context for defendant's admissions, and thus were non-hearsay). Take, for example, the below excerpt from the messages between Benson and "Charlie Trap" just before midnight on April 1, 2019:

> Charlie: I'm looking for coke
> Benson: Soft. Or hard.
> Charlie: I would prefer soft. Wya.
> Benson: I don't got no soft I just sold my last
> Charlie: Hard?
> Benson: Yeah
> Charlie: Are u driving? I can meet u or something
> Benson: How much u want
> Charlie: I got 50
> Benson: I'm in Copley
> Charlie: OK no wheels?
> Benson: At 855 Boylston Street
> Charlie: OK so u want me to come there?
> Benson: Yeah

The government is not offering Charlie's statements "I'm looking for coke" and "I would prefer

soft" as proof that Charlie really wanted coke and prefers powder.  Rather, the government is offering Charlie's statement to demonstrate Benson's state of mind and give context to Benson's response – that Benson believed that Charlie wanted coke and in response offered him what he had available, which was crack cocaine.  To the extent the Court does not wish to address each potential hearsay objection at this time, the Court could find the messages admissible for Rule 404(b) purposes but preserve the defendant's ability to make hearsay objections when the government submits its final exhibit list.

## CONCLUSION

For the foregoing reasons, the Court should permit the admission of evidence from Benson's phones regarding the defendant's drug dealing activity and his intent to acquire a firearm in the months preceding his arrest by the Boston Police on April 5, 2019, for the limited purpose of demonstrating his knowledge, motive, and intent to possess the firearm and ammunition in this case.

Respectfully submitted,

UNITED STATES OF AMERICA

By its attorney,

NATHANIEL R. MENDELL
Acting United States Attorney

/s/ Elianna J. Nuzum
Elianna J. Nuzum
Fred M. Wyshak, III
John Joseph Moakley U.S. Courthouse
One Courthouse Way, Suite 9200
Boston, MA 02210
elianna.nuzum@usdoj.gov
fred.wyshak2@usdoj.gov
617.748.3100

Dated: March 25, 2021

## CERTIFICATE OF SERVICE

      Undersigned counsel certifies that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants.

                                                       */s/ Elianna J. Nuzum*
                                                         Elianna J. Nuzum
                                                         Assistant United States Attorney

Dated: March 25, 2021