UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>RAHSHJEEM BENSON,<br><br>        Defendant. | Criminal No. 19-CR-10174-LTS |

### GOVERNMENT'S SENTENCING MEMORANDUM

On Friday, April 5, 2019, Rahshjeem Benson was found with a loaded stolen firearm on his person at Whiskey's Bar on Boylston Street in downtown Boston. The firearm was recovered after Boston police observed Benson sell crack cocaine outside the bar, recovered the crack cocaine from his purchaser, and went inside the bar to arrest Benson. Benson struggled with officers inside the crowded bar for several minutes. Directly after placing Benson in handcuffs, officers escorted him out of the bar, where they searched him and recovered the firearm. Benson has been convicted by a jury of being a felon in possession of a firearm. This is the defendant's second gun conviction. His conduct posed significant danger to the public – including all of the innocent bystanders seen on Whiskey's surveillance video as Benson sat at the bar armed with a loaded gun, engaging in drug deals outside – and demonstrates the defendant's utter disregard for the law. Accordingly, to adequately punish the defendant and deter him and others from similar offenses in the future, the government must now ask the Court to sentence Benson to 120 months of imprisonment – the Guidelines sentence as calculated by Probation – and 3 years of supervised release.

**BACKGROUND**

On November 3, 2014, Benson was convicted in the Lynn District Court on a charge of possession of a firearm without a FID card in violation of M.G.L. c. 269, § 10(h).  On May 7, 2008, Benson was convicted in Suffolk Superior Court on multiple counts of distribution of a Class B substance and committing a drug violation near a school or park in violation of M.G.L. c. 94C, §§ 32A(a) and 32J.  Each of these crimes is punishable by more than one year in prison. PSR ¶ 8.

On April 5, 2019, Benson knew that he had been convicted in a court of an offense punishable by a term of imprisonment of more than one year.  In connection with his 2014 conviction, he had been sentenced to 2 years of imprisonment in the House of Corrections, which he served.  In connection with the 2008 convictions, he had been sentenced to 3½ years to 3½ years and a day in state prison, which he served.  PSR ¶ 9.

Around 7:40pm on Friday, April 5, 2019, officers in the Boston Police Department's District 4 Drug Control Unit began an undercover operation in the area of Newbury Street and Dartmouth Street in downtown Boston.  Officer Matthew Ryan, wearing plainclothes, was deployed as an undercover officer, while other Drug Control Unit officers, also dressed in plainclothes, maintained surveillance. PSR ¶ 10.

Officer Ryan approached an unknown black male later identified as Philip Walsh, a.k.a. "Philly," on Boylston Street, about where he could buy some "grease," or crack cocaine.  Walsh told Officer Ryan that "Six Nine" was in the area.  The two began walking and conversing. Officer Ryan agreed to pool funds and share with Walsh the drugs they were able to purchase.  A person on the street allowed Walsh to borrow his phone; shortly before 8pm, Officer Ryan heard Walsh say into the phone words to the effect of, "Six Nine, it's Philly, can I get 3 for $50?  I'll

be there in two minutes. I'm at Walgreens and I have a trailer with me." they approached Whiskey's Bar, located on the same block, at 885 Boylston Street, Officer Ryan gave Walsh $40 in pre-recorded buy money and then crossed Gloucester Street to watch while Walsh met with Benson. PSR ¶ 11.

Officers observed Walsh go over to a window at Whiskey's and wait for an individual inside. Officer Ryan observed Benson – who he knew to be "Six Nine" – exit Whiskey's, and then Walsh and Benson headed down the alley behind Whiskey's. Officer Ryan observed Walsh hand an item to Benson; the two disappeared behind a building in the alley for less than one minute; and then Officer Ryan observed both Walsh and Benson reappear in the alley, manipulating objects in their hands. Benson walked back into Whiskey's, and Walsh rejoined Officer Ryan, holding one rock of crack cocaine. Subsequent testing confirmed that this substance was indeed cocaine base. After Walsh handed the rock to Officer Ryan, the other DCU officers came over and placed Walsh over arrest. PSR ¶ 12.

Five officers then entered Whiskey's to place Benson under arrest for distribution of crack cocaine. They identified themselves to the door staff as Boston Police and showed their badges. They walked over to Benson, identified themselves as Boston Police officers, and asked him to stand up and place his hands behind his back as he was under arrest. He was uncooperative and refused to comply, and officers struggled for several minutes to take him to the ground and handcuff him. Benson was eventually subdued and arrested. Immediately after his arrest he was escorted out of Whiskey's to be placed into a cruiser. PSR ¶ 13.

Outside of Whiskey's, prior to placing Benson in a marked cruiser for transport, Detective Boyle and Officer O'Donnell searched Benson incident to arrest. Officer O'Donnell recovered from Benson's sweatshirt pocket a silver bulldog pug revolver. Det. Boyle located

$1,050 in cash on Benson, plus the $40 of BPD buy money that Officer Ryan had given Walsh, and that Walsh had given Benson. During the course of the arrest and booking, police also recovered two iPhones, Benson's driver's license, and a Florida driver's license in a different individual's identity but with Benson's picture on it, among other items. PSR ¶ 14.

<u>Post-Arrest Investigation</u>

The firearm was found to be a Charter Arms .44 caliber bulldog pug revolver, with serial number 35476, loaded with five Smith & Wesson .44 caliber rounds of ammunition manufactured by CCI. The revolver could hold a maximum of five rounds at a time. The firearm was later successfully test-fired at the BPD Crime Lab and determined to be a working firearm. PSR ¶ 15.

Investigation revealed that the firearm had been stolen from the car of its owner in New Hampshire on or around March 12, 2019. PSR ¶ 15.

The government sought and obtained a search warrant for the two iPhones seized incident to Benson's arrest. PSR ¶ 16. The phones contained evidence that Benson had been seeking to acquire a firearm since at least October 2018, when he was shot in downtown Boston. *See* Dkt. No. 136 (Government's Motion In Limine to Permit 404(b) Evidence To Prove Knowledge, Motive, and Intent) at 5-6; Dkt. 150 (Government's Supplemental Submission in Support of Motion *In Limine*). In a text message on March 14, 2019, Benson indicated that he had obtained a firearm, stating that if a drug deal "Darin Cuz Nyc" sent his way went bad, "just know I'm shooting back." Dkt. No. 136 at 6.

The phones also contain evidence that Benson had been in engaged in drug trafficking for many months, and that he often engaged in drug distribution from Whiskey's bar at 885 Boylston Street in Boston, the same location from which he was found dealing drugs with the fully loaded

4

firearm in his pocket on April 5, 2019.  PSR ¶ 16; Dkt. No. 136.  Although on the night of April 5, he sold only a small amount of crack cocaine to Walsh, text messages indicate that he was also in the process of obtaining heroin or fentanyl to sell to another customer that night (PSR ¶ 16) and was also involved in trafficking much larger amounts.  For example, a conversation between Benson and "Reem Bullz" on February 22 and 23 indicates that Benson had sold Reem Bullz $2500 worth of cocaine, that was ruined when it was cooked; Benson also indicated that he "used the other half of wat I didn't give u . . . ," suggesting that he had started with $5000 worth of cocaine.  Dkt. No. 136 at 4.

Benson was originally charged in state court with both drug and firearm offenses relating to the April 5 incident.  PSR ¶ 62.  Benson was federally indicted on May 23, 2019, and his state charges were *nolle prossed* to the federal indictment.  *Id.*

## DISCUSSION

### I. Sentencing Guideline Calculation

While the U.S. Sentencing Guidelines ("USSG") are advisory and not mandatory, *United States v. Booker,* 543 U.S. 220 (2005), the First Circuit has made clear that "the guidelines still play an important role in the sentencing procedure, so that [ ] a court should ordinarily begin by calculating the applicable guideline range." *United States v. Gilman*, 478 F.3d 440, 445 (1st Cir. 2007).

Based on its computation of Benson's total offense level as 26, and his criminal history category as VI, Probation has calculated the GSR in this case to be a term of incarceration of 120 months, to be followed by a term of supervised release of one to three years.  The government concurs with Probation's determination of the GSR, and agrees with its position with respect to the defendant's Objections.

II.     **Application of the Section 3553(a) Factors**

The Court must consider the factors set forth in 18 U.S.C. § 3553(a) in determining a sentence that is sufficient, but not greater than necessary, to comply with the purposes of sentencing set forth in § 3553(a)(2).  These factors include the nature and circumstances of the offenses and the history and characteristics of the defendant, and the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, to provide just punishment for the offense, to afford adequate deterrence to criminal conduct, to protect the public from further crimes of the defendant, and to provide for the needs of the defendant.  They also require courts to consider the kinds of sentences available and the GSR.  In this case, these factors point to a sentence of imprisonment of 120 months, and to three years of supervised release.

A. **Nature and Circumstances of the Offense; Need for Sentence Imposed to Reflect the Seriousness of the Offense, Promote Respect for the Law, Provide Just Punishment and Deterrence, and Protect the Public**

In analyzing the "nature and circumstances of the offense" in this case, the Court should consider the circumstances of the defendant's arrest.  He was armed with a loaded handgun in his hoodie as he sat inside a busy downtown Boston bar on a Friday night.  The firearm had been stolen out of a car in New Hampshire approximately 3 weeks prior.

One need look no further than the daily newspaper to see the danger that illegal firearms pose in the streets of Boston.  In 2020, there were 276 shooting victims in Boston.  *See* BPD Crime Data, https://static1.squarespace.com/static/5086f19ce4b0ad16ff15598d/t/5ff37b7f0e058f15c9d98ef2/1609792383700/Shootins+Weekly+Crime+Overview_+2020+Year+End+4.pdf (last accessed October 14, 2021).

Against this backdrop, it is important to send a message that gun crime cannot be tolerated, particularly from people who have already been convicted of such crimes before. *See United States v. Laury*, 985 F.2d 1293, 1310 (5th Cir. 1993) (repeated convictions displayed tendency towards recidivism that warranted more serious sentence); *United States v. Smith*, 505 F.3d 463, 470 (6th Cir. 2007) (imposing above guidelines sentence where it was obvious that prior incarceration "was obviously not sufficient to comply with the purposes of § 3553(a)(2)"). The government notes that, although it appears that the defendant purchased a gun mainly for "protection," that protection was necessary because of his involvement in illegal drug trafficking, and he was prepared to "shoot[] back" if a "play" went bad, as he told "Darin Cuz Nyc." Dkt. No. 136 at 6.

Moreover, this Court should consider the defendant's relevant conduct – the fact that he was distributing drugs including cocaine, crack cocaine, marijuana, and heroin for at least 6 months prior to his arrest (*see* Dkt. No. 136 at 3-5), and possessed the firearm in connection with his illegal drug trafficking business – in arriving at an appropriate sentence. Illegal drugs have been linked to any number of societal harms, including intractable addictions and fatal overdoses. Benson claims that he has never personally been addicted to drugs, but doubtless his conduct fed many others' addictions. The impact of Benson's drug crimes on the community cannot be overlooked at sentencing.

A 120-month sentence of imprisonment, followed by three years of supervised release, is sufficient, but not greater than necessary, to reflect the serious circumstances of this offense, promote respect for the law, provide just punishment for the offense, afford adequate deterrence, and protect the public from further crimes of the defendant.

B. **The History and Characteristics of the Defendant**

The government acknowledges certain points that are reflected in the PSR. The defendant had a difficult childhood. He was initially raised by his grandmother because his mother was only 14 years old when she had Benson and struggled with substance abuse issues. PSR ¶ 64. As Benson grew up, his mother and grandmother alternated raising him (at times fighting over custody), and he experienced physical and emotional abuse inside his mother's home, although his grandmother's home was loving. *Id.* He also spent some time in foster care during custody battles. *Id.* Benson had no relationship with his father until he was 28 years old. PSR ¶ 66. He experienced some mental health issues in his childhood that were inadequately treated. PSR ¶ 75. He has four children, ranging from 3 to 14 years old, with whom he has maintained a relationship and for whom he has provided financial support. PSR ¶ 70. He was, at one point in his life (in 2012), ready to take his life on a different path and hoping to work with troubled youth to keep them out of trouble, PSR ¶ 80, although he ultimately was drawn back into the criminal lifestyle himself.[1] His text messages make clear that at least one purpose

---

[1] When he was interviewed by WBUR News in Boston on April 27, 2012, after serving almost four years in prison for drug trafficking at that point in time, he stated, "It's just like an addiction. Selling drugs is addiction. Money is addiction. . . . Just like a user that needs drugs to survive. I never was addicted to drugs. I don't like drugs, I don't do drugs. I was addicted to money." *See* https://www.wbur.org/news/2012/04/27/prisoner-youth (cited in PSR ¶ 80, n. 4). His text messages reflect his preoccupation with money, and his phone contained several videos depicting large sums of cash. *See* Dkt. No. 136 at 5 (describing a 20-second video from April 4, 2019, in which Benson has a large quantity of $100 bills spread out in his lap inside a car, and states, "Y'all n---- playing, Benson ain't playing, Y'all n---- playing, Y'all n---- playing, man. Y'all n---- playing, y'all n---- playing?" He then turns the camera to show his face and says, "Y'all n---- playing? I'm not playing. Y'all n---- playing" and pans back to the cash on his lap). This video was provided to the Court as proposed Trial Exhibit 26 in connection with the government's renewed motion *in limine*, which was denied just prior to trial. Dkt. No. 175.

of owning a firearm was for protection, after he had been shot on at least two occasions. *See* PSR ¶ 17; Dkt. 136 at 5-6.

However, the government's recommendation must also consider other, less sympathetic personal characteristics. Benson's adult record reflects numerous serious crimes, and an unwillingness to follow the law even while on supervision. For example, in 2005 he was convicted of stealing his cousin's safe containing approximately $20,000 in currency and jewelry (PSR ¶ 41), and in 2008, he was convicted of distribution of crack cocaine near a school/park on multiple occasions (PSR ¶ 43) and of assaulting a friend's girlfriend by choking her against a mattress and punching her in the face, leaving her with a swollen eye and bloody mouth (PSR ¶ 44). After serving a significant sentence in the drug case, and being given another chance at age 29 – going back to college, meeting with Gov. Deval Patrick's staff, and being profiled by WBUR – in 2014 he was convicted of larceny over $250 for stealing four Apple iPhones from a Target at which he was working; in 2014, he was convicted of possession of a firearm without a FID card, after multiple firearms were found in his and his co-defendants' apartment during the execution of a search warrant (PSR ¶ 46); and in 2019, he was convicted of conspiracy to commit bank fraud and aggravated identity theft, and aiding and abetting bank fraud, identity theft, and bank fraud, in a scheme in which the conspirators would apply for loans in stolen identities using fraudulent documentation, ultimately obtaining $123,292.11. He was out on bail, and later on probation, in his 2013 larceny case when he committed the 2013 gun offense. He was arrested in January 2019 in a Maine identity theft case[2]; shortly after that arrest, he returned

---

[2] This arrest, visible on the defendant's out-of-state criminal record and publicly reported, was the precursor to the federal case in the District of Maine described in PSR ¶ 47. The defendant was initially arrested by the state on January 17, 2019. *See* https://bangordailynews.com/2019/01/18/news/three-arrested-following-kittery-bank-scam/. He

9

to dealing drugs (*see* Dkt. No. 136, discussing drug sales in February 2019), and obtained and possessed the stolen firearm in this case. When he was approached by police in this case, and they identified themselves as much, he resisted arrest, struggling with them for several minutes.

The defendant's prior conviction for unlawful possession of a firearm is particularly troubling. *See United States v. Schmude*, 901 F.2d 555, 559 (7th Cir. 1990) ("[r]ationally, if a defendant has been convicted for the same offense more than once, he has demonstrated the need for greater sanctions to deter him from committing that same crime again -- greater sanctions than might be required for a defendant who has never been convicted of a similar offense").

Altogether, the history and characteristics of the defendant do not justify a sentence outside the GSR, but rather point to the GSR sentence: 120 months. The government recognizes that this is a substantial sentence that will result in substantial disruption to Benson's life and to that of his family. However, it is an appropriate sentence given all of the § 3553(a) factors. The government notes that, even after serving this sentence, Benson will be in the prime of his life with the opportunity to live a law-abiding life and be present for most of his children's teenage years. Just 8-16 credit hours shy of a bachelor's degree (PSR ¶ 79), and with the capacity for understanding demonstrated in his WBUR interview, Benson clearly has the ability to take a new path after completing his sentence.

The Government does not object to the defendant's sentence in this case running concurrently to his sentence in the case from the District of Maine, from the date of sentencing forward, which effectively carves 2 years and 7 months off his total sentence, such that he is actually serving less than 7.5 years beyond the sentence imposed by the District of Maine for

---

was federally indicted on June 20, 2019. *See United States v. Rahshjeem Benson et al.,* 2:19-cr-00122-DBH-1 (D. Me.) (Dkt. No. 3).

completely separate conduct. The government believes this is appropriate, especially given that the defendant's longest sentence prior to the District of Maine case was 3.5 years (PSR ¶ 43), and he received 57 months in the District of Maine.

## CONCLUSION

A sentence of 120 months incarceration, along with 3 years of supervised release, is necessary in this case to reflect the seriousness of the offense of conviction, to promote respect for the law, to adequately punish Benson for his criminal conduct, to deter him and others from offending in the same way again, and to protect the public.

For the foregoing reasons, and those to be articulated at the sentencing hearing, the government respectfully recommends that this Court impose a sentence of 120 months imprisonment, to be followed by a three-year term of supervised release, as well as the required special assessment. Such a sentence would be sufficient, but not greater than necessary, to reflect the seriousness of the offense and the goals of sentencing.

Respectfully submitted,

NATHANIEL R. MENDELL
Acting United States Attorney

/s/ Elianna J. Nuzum
Elianna J. Nuzum
Fred M. Wyshak, III
Assistant United States Attorneys
John Joseph Moakley U.S. Courthouse
One Courthouse Way, Suite 9200
Boston, MA 02210
elianna.nuzum@usdoj.gov
fred.wyshak2@usdoj.gov
617.748.3100

Dated: November 3, 2021

## **CERTIFICATE OF SERVICE**

      Undersigned counsel certifies that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants.

                                                */s/ Elianna J. Nuzum*
                                                Elianna J. Nuzum
                                                Assistant United States Attorney

Dated: November 3, 2021